I would like to reserve two minutes for rebuttal, if I may. For the record, please introduce yourself, Ms. Silbert. Thank you. Good morning. My name is Rebecca Silbert. I'm representing Mohamed Abdelrafi, who is the petitioner appellant in this action. Mr. Abdelrafi was a criminal defendant in Santa Clara County in 1997. Would you mind speaking up a little louder, please? Thank you. And in his state trial, the state prosecutor was given a gift, a huge gift, by Mr. Abdelrafi's defense attorney in violation of every duty that Mr. Abdelrafi's defense attorney owed to his client. His attorney, Bramall Hamilton, gave the prosecutor three defense reports. He actually gave him eight defense reports we've raised today. Prepared by public defender investigators. That's correct. Prepared by public defender investigators. In anticipation of using that information on cross-examination. We don't know. That's not something that we know. The reports were prepared by the defense investigator in preparation of the defense. There were 12 of them prepared by the defense investigator roughly five, six months before trial. Did the investigator testify in the case? She did not. I'm sorry. The underlying trial. Well, actually, she did not testify in either the underlying trial or in the district court evidentiary hearing. Her deposition was part of the record before the district court. Was the information that the investigator accumulated used to cross-examine anybody in the original trial? It was. Isn't it standard practice for public defenders to turn over reports of investigators when the report is used to cross-examine people? I was there for 17 years and watched that happen. I can't tell you how many times I saw public defenders turn over investigative reports before trial that contained information that they were going to use during the trial. That certainly is something that happens. And a representative of the Santa Clara Public Defender's Office testified that that's something that happens. In this case, however, these reports were so damaging that that would not have been a reasonable tactical decision. The only suggestion offered by the government for what could make this reasonable was a tactical decision by Mr. Hamilton that he would give the reports to Mr. Alcala, the prosecutor, so that he could avoid an objection. First of all, the law was clear then and now that that objection would not have been, should not have been sustained. That notwithstanding, the facts before the court didn't show any such reasonable strategy. Mr. Hamilton gave the report for witnesses. He didn't cross-examine. He didn't give a report for a witness that he did cross-examine. He gave a report for a witness that no one called. There's no evidence that there was anything reasonable behind his decision to hand over eight reports. Well, what do you do with this from the district court? The fundamental conclusion reached herein is that the prosecutor was already aware of the witnesses in question. As such, the same basic information, all of which concerned only prior acts similar to those actually alleged and proven, would have been elicited regardless. Thus, there was no substantial prejudice from any air by counsel. I do not quibble with the finding of fact that he was aware of the witnesses' names. We never have objected to that. There were many people identified in the police reports. Our objection is to the conclusion that from that information, it would have been that it would have looked the same absent error by counsel. There is not evidence in the record to support that conclusion. The evidence in the record shows that when the defense investigator interviewed these witnesses, she was the first person ever since the police to have done so. The prosecutor said that in his closing argument. There has been some confusion since then, because he later said that he did interview them before the defense investigator, and then he said he actually didn't remember. At the time of the trial, he told the jury the defense investigator was the first person. That's August and September of 1996. January, February of 1997, we have Bramlett-Hamilton's notes from the trial conference with the trial court judge where the trial judge is presented with the State's request to admit evidence of Candace arising from the police report, and the trial judge says that's not enough. Those are from Bramlett-Hamilton's notes on January 23, 1997. It was a Thursday. The next day, Friday, on the record, Mr. Alcala, the prosecutor, is able to give a far more detailed proffer about what those girls would say in trial. That proffer matches exactly the defense reports, and not only that, the proffer that he gives on January 24 matches Alcala's underlinings on the defense reports. So in 24 hours or less, he's gone from being told, you can't get this evidence in, to saying, no, no, no, I have so much more. And that more comes from the defense reports. He then is permitted under 1108 and 1101 to introduce the evidence at trial. Does that respond to the Court's question? A trial, Hamilton cross-examined Candace using the defense investigator's report. This reason would conclude that Hamilton turned the reports over to avoid an objection by Alcala during cross. Given that Hamilton did not turn over all the defense reports, it appears that he did have a strategy in mind. Your reaction? But what strategy? He didn't turn over the report for Jamie, who was a charged victim, who he called Jamie. But that's not up to us to determine, is it? It is up to the Court to determine that the strategy is reasonable. It's not simply enough to say there was a strategy. The strategy has to be reasonable to survivor view. It was not reasonable, both because there's no rhyme or reason to what got turned over and because the evidence was so damaging. I had public defenders all the time tell me information they'd found that was damaging to their case. It was part of their way of presenting themselves as rational people upon whom I could rely in making plea bargains and deciding what to do with cases. I had public defenders come to me all the time. I'm not hiding anything. Here's what I have. Let's make a deal. Let's do this. I'm sorry. If he wasn't hiding anything, he would have given all 12. He retained four for no apparent reason, one of which was for the charged victim. One would think if he had any sort of a strategy, it would have been to give at least the report for the charged victim, who he cross-examined at length, and not the report for Kareen Morgan, called by neither side. What about the idea that, hey, this is just ancillary stuff, that the evidence itself was so strong that it really didn't and wouldn't have made any difference, and therefore there is no prejudice? There are, I think, two main responses to that. Number one, if you look to the prosecutor's closing argument, yes, this was 1101-1108 evidence. However, it was relied upon extensively by the prosecutor. He emphasized to the jury, I only need a feather. I don't have to prove it beyond a reasonable doubt. It's because of this cumulative evidence. It's because of the weight of the evidence that I win. Number two, if you compare, if the Court were to do an independent review of the two sets of testimony, the charged victims and the other act's evidence, the other act's evidence is significantly more direct, more purposeful, more manipulative, more harmful, more sexual, more intentional. The actual acts as charged, as admitted by the prosecutor in his closing, are minimal. The other act's evidence is very, very serious. The disproportionate nature, along with his ability to rely on the lower standard of proof, is what makes this prejudicial. And unless there's further questions, I will reserve. You may reserve, counsel. Thank you. We'll hear from the government. May it please the Court, Violet Lee from the California Attorney General's Office for Applee Lockyer. Yes, Lee. In this case, defense counsel, Mr. Hamilton, provided a number of defense investigators reports to the prosecutor, Mr. Alcala. Appellant claims that from these reports, Mr. Alcala obtained information damaging to the defense. The district court held an evidentiary hearing in this case, and from that evidentiary hearing, we know the following. We know that Mr. Alcala took over this case, took over the prosecution of this case at trial sometime before May 3, 1996, which is the date of the preliminary hearing which he handled. The case involved lewd and lascivious conduct by appellant, and the victims were Crystal and Jamie. Now, before the preliminary hearing, the prosecutor saw two police reports that showed that there were other victims of similar lewd misconduct by this very same appellant. One was a 1994 police report. That report named Candace as a victim of indecent exposure. It also mentioned that her sister, Sharman, was a corroborating witness. There's also a 1995 police report, and that report also indicated that both Candace and Sharman had been victims of lewd conduct by this same appellant. Well, now, what would be an appropriate motive for Mr. Hamilton to turn all of this over? You heard counsel's comment that even though we don't second-guess strategy, the strategy has to be reasonable. What's your response? Well, Mr. Hamilton did not testify at this hearing, so we don't have from his mouth what his thinking may have been. But certainly, we do have testimony from an expert witness who said that this was a strategy that is often employed by defense counsel to turn over defense investigators' reports if they think that they may be using these reports in the course of cross-examining prosecution witnesses, and they are obligated to turn over these reports if they are actually going to be referring to them. Otherwise, there would be an objection by the prosecutor. In this case, the prosecutor testified at the hearing that had Mr. Hamilton not turned over these reports to him and then he used them, the prosecutor would have objected in front of the jury, which doesn't particularly look good for the defense counsel. We also know from the trial record that the defense counsel did actually refer to a defense investigator's report in cross-examining one of these girls, and I can't remember if it's Charman or Candace, but it's referenced in the State Court of Appeals decision. It's actually referenced in the, I think it's the district court's opinion as well. So we know that, you know, there was apparently he did intend to use these reports in his cross-examination, and he did, in fact, use at least one. So the fact that he turned over possibly more than what he needed to turn over means probably that he was speculating that he may have needed, was going to be using them more for cross-examination than he actually did. I mean, with the record, I just want to remember what I can remember from the record. Had the government turned over a witness list to the defendant before he turned over these defense reports? The prosecutor, one week after the preliminary hearing in May, turned over to, delivered or sent to the defense counsel a witness list that included one of these girls named in the police reports, which is. Some of the defense investigative reports were broader than the witness list. He didn't match his defense reports to the witness list. That's correct. What is the significance of that in analyzing the reasonableness of defense counsel's actions? In other words, he could have just, he had all these defense reports, he could have picked them, and I think counsel's arguing this, he could have said, well, let's see, these are the possible witnesses, I'll just give him those reports in case I have to cross-examine. Instead, he blanketed the prosecution with all these other reports. So now how do we analyze that when we look at reasonableness? Well, we certainly know that this was a preliminary witness list from the prosecutor, and as the prosecutor testified, he's never had a case where he didn't amend his witness list. The witness list that was delivered to the defense counsel also said at the bottom that any person named in a report is a potential witness. Were the reports turned over at the same time, listing the other victims, Candace and Charmaine? Excuse me, Your Honor, could you repeat the question, please? Were the reports turned over at or about the same time that the witness list was made available? No, Your Honor, this is where it becomes quite clear that the prosecutor knew about Candace and Charmaine and had the information that was in these investigator reports long before the investigator even interviewed these girls. We know that the prosecutor had information about Candace and Charmaine in May when he read these police reports. We know from his testimony that he understood that these two girls were potential corroborating witnesses. When were these police reports turned over to the defense attorney? The police reports were always available to all the parties, I believe. Always available? What does that mean? Everything is always available. You're telling us that there were police reports that identified these two ancillary witnesses. When were they turned over to the defense? Were they not turned over to the defense? You know what I'm talking about? You're talking about the police reports or the defense investigators? The police reports. Police. You started that out by telling us they're police reports that identify Charmaine and this other person. Right. When were those turned over to the defense? I don't have any information about the date that the defense attorney obtained those police reports. Well, is it clear that they actually got the reports at some point or not? Well, one of those reports is actually the police report that initiated the prosecution in this case. That's the 1995 police report. And that police report also mentioned Charmaine and Candace. And that was turned over to the defense? Well, again, that's not part of the record, but I certainly assume that defense counsel would have the very police report that is involved that generated the charges for which he's defending his client. But we do know that the defense investigator did not interview Charmaine and Candace until September of 1996. This is many, many months after the prosecutor was already informed by the police reports about these two victims. We also know from the prosecutor's testimony at the hearing that he most likely interviewed these girls along the way before the defense investigator interviewed them. In the 1995 police report, Jamie, a charged victim, stated that her friend Charmaine told her that Abdul-Rafi did the same thing to her and Candace. That's in the absorptive record. So that's the kickoff police report. Okay. Anything else, counsel? No, Your Honor, unless the Court has other questions. How would you address the prejudice issue, then, regarding the turning over of these reports? And we've been talking about reasonableness. How about the prejudice issue? Well, certainly, Your Honor, that's easily where the analysis can begin, because there is no prejudice in this case. If the prosecutor knew from the outset of this case, from the police reports about Charmaine and Candace, went out to talk to them or called them on the phone, which, as a 15-year veteran of the district attorney's office, he certainly would have done in his usual practice with witnesses, especially child witnesses. He wouldn't be calling these people into court out of the blue without knowing what they were going to say. And so, I think, in our view, it's very clear that the prosecutor did not know that the child witness was going to be in effect an assistant of counsel hearing. Do we know that the prosecutor said that he did that? We know that he testified that he would have done it as part of his normal practice. Well, after 9 years, Your Honor, as the district court said, after 9 years, who can remember anything in such a detail? But we also know that these particular two girls, Charmaine and Candace, the lewd conduct that was involved with respect to these two girls was not all that damaging when you look at the conduct committed against the charged victims. In fact, you have a, cambiar statement from the trial court at the time the trial court admitted this testimony as other crimes evidenced. They are less serious than the charged conduct and the two counts charged in the information, and therefore, this is not going to result in some kind of prejudice to the defendant. We know that the charged victims talked about actual touching, you know, groping. We know that the uncharged victims, Sharman and Candice, talked about indecent exposure. There was a kiss on the shoulder on Halloween night, but we're not talking about groping of breasts, groping of buttocks, which is what the charged victims testified to. So. Thank you, counsel. Thank you, Your Honor. Your time has expired. Ms. Silbert, do you have some reserve time? I do. Thank you. I would like to clarify some points. Unless the Court has a question, I would like to clarify some points. Go ahead. First, Respondent stated that Mr. Hamilton would have been obligated to turn over the reports if he intended to cross-examine the witnesses. The law was clear he would not have been obligated. It might have generated an objection, which would, might have been sustained or might not have. What does 1054.3 require under the California Penal Code? I'm sorry. It requires turning over reports of witnesses that you call, so witnesses that the defense was calling, or turning over reports written by the defense investigator if you call the defense investigator. That's all. Under the strategy and reasonableness standard, though, there was an anticipation that if he didn't do that, there would be an objection in front of the jury and all that stuff. So that's in the makeup of determining whether he was reasonable in turning it over to maybe not prejudice the jury. That is a potential reason. But in this case, it doesn't make sense. He turned over reports for witnesses, for a witness to hear who he never even cross-examined. And he did not mention the defense report except once. Except lawyers always turn over more than less or frequently turn over more than less. And it turns out then you don't use it. But let's go back to this 95 report. The report, apparently the original police report in this case, identifies these two witnesses. Is that right? And those are always turned over. And so isn't it supported the trial court's conclusion that the prosecutor knew of these people and would have talked to him anyway, supported by the record? I don't believe so, for a couple of reasons. First of all, the police report clearly didn't have enough for the prosecutor to put Charmaine on his witness list. No, but it identified both of them in saying they did the same thing to them. Well, in the 95 police report, it's, I believe, triple or quadruple hearsay. In the 94 report, it lists Charmaine as the sister who corroborates what Candace says. It clearly didn't rise to the level to go on a witness list that he generated at that time. The defense reports are significantly, significantly more detailed. We also quibble extensively with the state's statement that the prosecutor talked to the girls prior to the defense investigator. But that's briefed. Thank you, counsel. The case just argued will be submitted for decision.
judges: Brunetti, O'scannlain, Trott